**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CHRIS WAYNE EMORY,

           Petitioner,

  v.

RON BARNES, Warden,

           Respondent.

_____/

No. C 11-2680 JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY; DIRECTIONS TO CLERK**

     Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Chris Wayne Emory, challenging the validity of a judgment obtained against him in state court.[1]  Respondent filed an answer to the petition.  The case was then reassigned to the undersigned.  Petitioner has not filed a traverse although given an opportunity to do so.

## I.  PROCEDURAL HISTORY

     In 2008, an Alameda County jury found petitioner guilty of first degree murder.  (CT 331-32.)  He was sentenced to state prison for twenty-five years to life for the murder, plus an additional twenty-five years for personal use of a firearm in committing the murder.  (Id.)

---

[1] Petitioner initially named A. Hedgpeth, former warden of Salinas Valley State Prison, as the respondent in this action.  The California Department of Corrections online inmate locator service confirms that petitioner has been transferred to High Desert State Prison ("HDSP").  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ron Barnes, the current warden of HDSP, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.  Petitioner is reminded that he must keep the Court and all parties informed of any change of address.

United States District Court
For the Northern District of California

On December 9, 2009, in a reasoned opinion, the California Court of Appeal affirmed the judgment.  People v. Emory, No. A122557, 2009 WL 4680009 (Cal. Ct. App. Dec. 9, 2009).  On February 18, 2010, the California Supreme Court summarily denied the petition for review.[2]  The instant petition was filed on June 3, 2011.

## II.  STATEMENT OF FACTS

The California Court of Appeal found the facts underlying petitioner's conviction to be as follows[3]:

> An eyewitness testified that [petitioner] fatally shot 15-year old Anthony Dailey during an altercation arising from Dailey's theft of clothing from [petitioner]'s best friend.  The shooting occurred in the home of the eyewitness, Rachel Allen.  Dailey was a friend of Allen's sister, and also well known to Allen from the neighborhood.  In June 2007, Allen's sister invited Dailey to sleep overnight on Allen's living room sofa.  Allen had "an open-door policy" and friends from the neighborhood freely visited Allen's apartment and sometimes slept overnight.  Allen awoke on June 3, 2007, to find Dailey sleeping on her sofa.  Dailey was still at Allen's apartment when her ex-boyfriend, Marcus Williams, dropped by early that morning with [petitioner].  Williams was 22 years old and [petitioner] 20 years old.  Williams was partially disabled as the victim of an earlier shooting.
>
> There were bad feelings between Dailey and Williams.  A few weeks earlier, Dailey had stolen Williams's car and started stripping it.  It is unclear on this record, but it appears that Williams recovered the car.  But Williams did not recover clothes he had left in the car.  Dailey kept those clothes and wore them around the neighborhood.  Williams felt that Dailey's behavior was "a form of disrespect."
>
> When Dailey and Williams met at Allen's apartment, Dailey was wearing Williams's jacket.  Williams stood at the entrance to Allen's living room and spoke to Dailey who was sitting on the sofa.  Williams said something like, " '[y]ou got my clothes.' "  Dailey stood up and said: " 'Quit talking to me.' "  The young men stood within two feet of each other arguing loudly and swearing at each other.  [Petitioner] entered the apartment and approached Dailey and Williams.  Williams told [petitioner]: " 'it's cool.' "
>
> [Petitioner] stood close to Dailey, raised his arm, and shot Dailey in the head.  Allen testified that [petitioner] "[n]ever said one word" before shooting Dailey.  Allen estimated that the gun was less than a foot from Dailey's head when [petitioner] fired, which is consistent with the autopsy that revealed gun powder burns on Dailey's skin near his ear.

---

[2] See http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0&doc_id=1931294&doc_no=S179433.

[3] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

Allen's sister testified that respect is important on the streets of West Oakland, and men in the neighborhood commonly settle their disagreements with guns, not fists. Allen's sister also testified that she saw [petitioner] with a 9-millimeter handgun days before the shooting. A bullet of that caliber was recovered from the scene of the crime.

Immediately after the shooting, [petitioner] ran from the apartment. Williams walked from the apartment and stayed nearby as Allen waited for the police to arrive. Williams was gone by the time the police arrived. [Petitioner] boarded a long-distance bus. The police apprehended [petitioner] the next day, on June 4, 2007, in Salt Lake City, Utah, when the bus made a scheduled stop. [Petitioner] was traveling with three large suitcases filled with clothes, photographs, and miscellaneous papers. [Petitioner] made a telephone call to Oakland from the Salt Lake City jail in which [petitioner] said he was " 'snatched' " off the bus and complained that " '[s]omebody was snitching or something,' " and that there were " 'motherfuckers snitching on' " him.

[Petitioner] confessed the killing to the police, but the confession was suppressed at trial because much of the police interview was conducted after [petitioner] invoked his right against self-incrimination. (U.S. Const., 5th amend.) In his statement to the police, [petitioner] began by denying all knowledge of the shooting and then admitted participation in the shooting in several stages. [Petitioner] first denied knowing anything about the shooting, then said he was on the street when he heard a gunshot, then said he was at the door of Allen's home when he heard an argument over clothes and a gunshot, and then said he was inside the apartment during the argument between Williams and Dailey when Dailey pulled a gun and [petitioner] tackled Dailey and the gun went off accidentally. Finally, [petitioner] admitted bringing the gun into the apartment and using it to shoot Dailey. [Petitioner] said he pointed his gun at Dailey to stop the argument and then shot Dailey when he thought Dailey was reaching for a gun. [Petitioner] moved to suppress the confession and the court ruled that the confession could not be introduced in the prosecution's case in chief. The jury did not hear [petitioner]'s confession.

At trial, a police officer testified that Williams was arrested in connection with the police investigation of the shooting but released without being charged after making a statement. Williams was subpoenaed as a witness for [petitioner]'s preliminary hearing but did not appear and could not be located for trial.

The defense presented no witnesses at trial. In closing argument to the jury, defense counsel argued that Williams, not [petitioner], was the shooter, and that Allen was covering up for Williams, who was her ex-boyfriend.

The jury rejected the defense and convicted [petitioner] of first degree murder with personal use of a firearm in the commission of the murder. (Pen.Code, §§ 187, subd. (a), 189, 12022.53, subd. (d).)[4] The court sentenced [petitioner] to an indeterminate sentence of 25 years to life for Dailey's murder, plus an additional 25 years for personal use of a firearm in committing the murder. (Pen.Code, §§ 190, subd. (a), 12022.53, subd. (d).)

---

[4] Except as otherwise specified, all statutory references herein are to the California Penal Code.

People v. Emory, No. A122557, 2009 WL 4680009 at *1-2 (Cal. Ct. App. Dec. 9, 2009).

## III.  DISCUSSION

A.      Standard of Review

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict."  Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal citation omitted).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the

United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, the only state court to address the merits of petitioner's claims was the California Court of Appeal on direct review.  The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and it is the Court of Appeal's decision that this Court reviews herein.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.    Petitioner's Claims

Petitioner claims his conviction and sentence are invalid because: (1) the trial court erroneously denied petitioner's Batson/Wheeler[5] motion; (2) the trial court failed to hold a hearing on petitioner's motion for appointment of substitute counsel under Marsden[6]; and (3) the trial court denied petitioner's motion to represent himself under Faretta[7].  The Court addresses each claim in turn.

1.    Batson/Wheeler Claim

During jury selection, the prosecutor exercised peremptory challenges against four prospective African-American jurors.  Emory, 2009 WL 4680009 at *3.  Petitioner, who is African-American, made a Batson/Wheeler motion.  (Id.)  After finding petitioner had made out a prima facie case of purposeful discrimination, the trial court denied the motion, further finding there were race-neutral justifications for the peremptory challenges.  (RT 522-39.)  Petitioner claims the denial of the motion was erroneous.  (Petition at 6.)

//

---

[5] Batson v. Kentucky, 476 U.S. 79, 89 (1986); People v. Wheeler, 22 Cal. 3d 258, 280 (1978).

[6] People v. Marsden, 2 Cal. 3d 118 (1970).

[7] Faretta v. California, 422 U.S. 806, 832 (1975).

United States District Court
For the Northern District of California

a.     Background

The California Court of Appeal denied the claim as follows:

The prosecutor and defense counsel each had 20 peremptory challenges.  (Code Civ. Proc., § 231, subd. (a).)  About midway through the jury selection process, defense counsel objected that the prosecutor was exercising her peremptory challenges on the basis of race.  At that point, the prosecutor had exercised ten peremptory challenges and four of those challenges concerned African-American prospective jurors.

. . .

***1. Prospective Juror J.P.***

J.P. was a single, 22-year-old African-American male living in San Leandro and working as a driver for an automobile repossession company.  The prosecutor stated several reasons for striking J.P. from the jury panel: (1) J.P. showed a disrespectful attitude toward the trial proceedings by "saunter[ing] into the courtroom" late, "about an hour and 15 minutes into the jury selection process," and by later responding to the judge, when asked how he was doing, by saying "[w]ha's up?";  (2) J.P. said during voir dire that he "hates the police"; and (3) he did not have "a very extensive work history" and was almost 23 years old, "close in age to the [petitioner]."  The prosecutor said she "should have moved to challenge him for cause" but neglected to do so.

Substantial evidence supports the prosecutor's stated reasons for striking J.P., and the trial court reasonably concluded the reasons were race-neutral.  J.P. repeatedly showed a disrespectful attitude toward the court proceedings and the judge.  He was late to court and substantially delayed the court proceedings to the point where the trial court felt compelled to administer what it called a "public scolding."  J.P.'s late arrival required the court to read introductory jury instructions a second time, for his benefit alone.  His only stated reason for being late was that he was "running behind."  When the court conducted voir dire, [J.P] was casual in his manner and inattentive to the questions.  Several times, the court had to repeat questions while admonishing [J.P.] to "listen carefully."

J.P. also, as the prosecutor noted, said he "hate[s] the police."  On a form juror questionnaire completed by all panelists, J.P. was asked if he ever had "a good or bad experience with a police officer" and he wrote: "The police beat me like a rag doll in Modesto!"  J.P. explained, in closed session, that he was arrested in Modesto for a domestic dispute with his girlfriend.  J.P. said several police officers pulled him from his home and beat him without cause.  J.P. was charged with disturbing the peace and resisting arrest, but the charges were dismissed.  The police incident occurred less than two years before he appeared as a prospective juror.  During voir dire, the prosecutor told J.P. that police officers would be testifying at trial and asked J.P. if he had "a problem with the police."  J.P. responded: "Yeah, I hate the police."  J.P. added, "personally, I am biased against police.... Police in general.  [¶] I don't like police.  I don't like them.  Modesto police if you really want to get technical."  Defense counsel asked J.P. if he had any problem with the Oakland police and J.P. said, "I haven't interacted with them....  I choose not to."

United States District Court
For the Northern District of California

Substantial evidence also supports the prosecutor's statement that J.P. was young and without an extensive work history.  He was "going on 23" years old and thus about the same age as [petitioner].  His work history consisted of jobs at a fast-food restaurant, department store, upholstery cleaner, and vehicle repossession company.  Although J.P. said during voir dire that he was unemployed for only a "few months," his list of jobs accounts for less than three years over a five-year period.

"The credibility of a prosecutor's stated reasons 'can be measured by, among other factors ... how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' "   (*Hamilton, supra,* 45 Cal.4th at p. 900.)  The prosecutor's reasons for striking J.P. from the jury panel-disrespect of the trial proceedings, a negative experience with law enforcement, and immaturity-are reasonable grounds and well-founded in accepted trial strategy.  ( *Id.* at p. 905; *People v. Lenix, supra,* 44 Cal.4th at p. 628.)

. . .

The genuineness of the prosecutor's stated reasons for striking J.P. was largely uncontested by defense counsel at trial.  Defense counsel told the court that if J.P. "had been the only guy that was African-American that [the prosecutor] kicked, we wouldn't even be talking about him."  The trial judge found solid nondiscriminatory reasons for striking J.P.: "I agree with [the prosecutor] wholeheartedly in terms of her observations and the characterization" of J.P.'s behavior and voir dire responses.

. . .

**2. Prospective Juror J.D.**

J.D. was a single, 55-year-old African-American female living in Oakland or Emeryville and working for a hospice as a home health aide.  The prosecutor stated a number of reasons for striking J .D., chief among them the fact that J.D.'s brother was convicted of murder.  In connection with that fact, the prosecutor noted that J.D. attended every day of the trial and believed (mistakenly) that the prosecutor was the same one who prosecuted her brother.  Additional, subsidiary reasons for exercising a peremptory challenge to J.D. were her residence in a "very high-crime area in West Oakland" and prison inmate visitation.

Substantial evidence supports the prosecutor's stated reasons, and the trial court reasonably concluded the reasons were race-neutral.  In chambers, J.D. reported that her brother was convicted of murder in Alameda County about 15 years previously and died in prison.  Her brother killed his girlfriend in a domestic dispute.  J.D. said the killing was "a terrible thing" for her family and the victim's family "[b]ut things do happen."  J.D. also commented on her brother's relationship with his murdered girlfriend by saying "it's just like an apple and a pear trying to grow together, and you can't grow an apple and a pear together."  J.D. attended every day of her brother's murder trial and said the trial had been conducted in the same courtroom now occupied by [petitioner's] trial, and tried by the same prosecutor and defense counsel.  J.D. was not certain on this last point, saying she thought she recognized the attorneys but maybe she had seen them somewhere else in passing like "in the grocery store."

7

The prosecutor challenged J.D. for cause, which the court denied because J.D. said she was satisfied that her brother's trial was fair, and she showed no animosity toward the prosecution. The court, however, found sufficient basis for the prosecutor's exercise of a peremptory challenge. As with the earlier striking of the young man J.P., the court agreed "wholeheartedly" with the prosecutor's characterization of J.D.'s responses on voir dire. Those responses were troubling, and the prosecutor's reliance on J.D.'s negative experience with law enforcement to strike her from the jury panel was highly credible. Although J.D. denied animosity toward the prosecutor and law enforcement, J.D.'s life experience and comments suggested that she would have difficulty sending a young man to prison for murder.

The comparative juror analysis [petitioner] offers does not further his claim. [Petitioner] contends that a White female juror, M.S., showed hostility toward a prosecutor's office but was allowed to serve on the jury. M.S., who was seated as juror No. 3, reported confidentially that she was the victim of domestic violence in Idaho. M.S. felt that the district attorney's office there should have charged her boyfriend with attempted murder, not the lesser offense of domestic violence, and that his six-year prison sentence was too short. The prosecutor asked M.S. if her feelings about how the district attorney in Idaho handled her case would "transfer over into how you feel about the District Attorney's office in this case, or the District Attorney's offices in general? Would it cloud your judgment in any way in this case." M.S. answered: "Honestly, yes, it would." The prosecutor asked in what way, and M.S. said things are not always "cut and dry." When questioned further, M.S. said she would try to be a fair juror.

[Petitioner's] comparison of J.D. and M.S. is inapt. Although it is true that M.S. had a negative experience with a prosecutor's office, that experience was as a victim who felt that the offender had been treated too leniently. In contrast, J.D. was the sister of a murderer who died in prison, and J.D. minimized her brother's offense by commenting that he and his victim did not mix well, like apples and pears. "[A] prosecutor may reasonably surmise that a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution." (*People v. Farnam* (2002) 28 Cal.4th 107, 138; accord *People v. Rodriguez* (1999) 76 Cal.App.4th 1093, 1114 [panelist whose brother-in-law was convicted of murder reasonably challenged in murder trial].) M.S., by comparison, was likely to be sympathetic to the prosecution given her experience as a victim who believed her offender was punished too lightly. Moreover, M.S.'s expressed grievance lay with an Idaho prosecutor, whereas J.D.'s brother was prosecuted by an Alameda County prosecutor-and J.D. thought the very same prosecutor was representing the State in the current trial. Comparing J.D. to M.S., therefore, does not show the prosecutor challenged an African-American panelist who possessed the same characteristics as did a White juror she did not challenge. The two panelists possessed very different characteristics.

//

//

//

8

### 3. Prospective Juror L.T.

L.T. was a single, 56-year-old African-American male living in Oakland and working as a project accountant at an engineering firm. The prosecutor said she exercised a peremptory challenge against L.T. because he disparaged the way her office tried a prior criminal case where L.T. served as the jury foreperson, and L.T. was also displeased with her office's apparent determination that he, and not his roommate, was the aggressor in a fight.

Substantial evidence supports the prosecutor's stated reasons, and the trial court reasonably concluded the reasons were race-neutral. L.T. was the foreperson in an Alameda County attempted murder trial in 1998. On voir dire, the prosecutor asked L.T. if he had "any issue" with how the deputy district attorney in that case handled his duties. L.T. replied, "the whole jury [thought] it was almost a comedy of errors. It was deciding who was the worst attorney." Questioning continued: "Q. Oh, really, that bad. [¶] A. It was that bad. [¶] Q. Not a proud moment for the Alameda County District Attorney's office. [¶] A. Not at all." A prospective juror's negative experience on a prior jury is a reasonable basis for a peremptory strike. (*People v. Avila* (2006) 38 Cal.4th 491, 554.) L.T.'s experience was especially significant here, where L.T.'s prior bad experience was with the same prosecutorial agency present in this case.

L.T. also expressed displeasure with the prosecutor's determination that L.T., and not his male roommate, was the aggressor in a fight that left L.T. with a broken nose. On voir dire, L.T. said his roommate was arrested but never charged with criminal conduct by the Alameda County District Attorney's office. The court asked L.T. how he felt about that decision, and if he felt "the matter was handled appropriately under the circumstances." L.T. replied "yes." The prosecutor pursued the matter further: "Q. Did you take issue with that decision? [¶] A. At first I did. [¶] Q. You felt that the person should have been charged and prosecuted? [¶] A. Well, according to them, I pushed him. So, I pushed him off of me. And so I guess they considered me being the aggressor." As previously noted, our high court has " 'repeatedly upheld peremptory challenges made on the basis of a prospective juror's negative experience with law enforcement.' " (*People v. Lenix*, supra, at 44 Cal.4th p. 628.)

The comparative juror analysis [petitioner] offers does not further his claim. As an example of a White panelist with negative law enforcement experience who was allowed to serve on the jury, [petitioner] again offers M.S., the domestic violence victim who thought her boyfriend had been treated too leniently by an Idaho prosecutor. As previously discussed, the comparison is inapt. M.S. was a victim displeased with an out-of-state prosecutor. L.T. was displeased with the Alameda County prosecutor's office, and his displeasure rested on the fact that he believed the prosecutor's office perceived him as the aggressor instead of the victim. It is a far more negative experience to be thought the aggressor in a domestic disturbance and to receive no prosecutorial support than to be acknowledged as the victim and to have your assailant sentenced to six years in prison. Moreover, "[a]dvocates do not evaluate panelists based on a single answer," nor should reviewing courts. (*People v. Lenix*, supra, 44 Cal.4th at p. 631.) Unlike M.S., L.T. had two negative prosecutorial experiences-as a juror and a party-and in both instances he

openly questioned the prosecutor's capabilities.  Contrary to [petitioner]'s assertion, these two panelists were not similarly situated.

### 4. Prospective Juror E.M.

E.M. was a married, 50-year-old African-American male living in Emeryville and working as a letter clerk for the post office.  The prosecutor stated several reasons for striking E.M.: (1) he was a postal clerk at the 7th Street station, and the prosecutor had prior murder trials in which staff from that same postal station had shown themselves to be "uncooperative witnesses" and not "law abiding" individuals; (2) he visited a friend in jail; (3) he was familiar with the crime scene area; (4) he was uncertain about the effectiveness of the criminal justice system; (5) he was uncomfortable about making a decision impacting the life of [petitioner]; and (6) he might show sympathy to [petitioner], who was a young man near in age to E.M.'s son.

All of these reasons are supported by substantial evidence.  E.M. was a postal clerk at the 7th Street station, although it is impossible to confirm the prosecutor's stated experience with other staff members at E.M.'s workplace.  He visited a friend in jail, who was serving time for drug possession.  When asked on the juror questionnaire if he was familiar with the Oakland streets where the crime occurred, E.M. said yes.  On voir dire, he explained that he goes "that way sometimes on [his] way to work." But when the judge asked E.M. if he ever spent any "significant amount of time" in that particular area, he said, "[n]o, not really."

The juror questionnaire asked all jurors to state their "feelings about the effectiveness of the criminal justice system."  E.M. did not answer the question.  The prosecutor asked about the blank space on the questionnaire form, and E.M. explained that at the time of completing the questionnaire, he "wasn't sure" but "as you guys proceeded, I came to wits with, hey, it's my duty. [¶]  So, I mean I don't have a problem with it.  You know, it was just I was stunned when we first-you know, they brought up with what the case was going to be about.  I thought it was petty theft or, you know, something, you know, something smaller."  Voir dire continued: "Q. So, when you heard that this was going to be a murder trial, that impacted you in your idea of what the criminal justice system was? [¶]  A. Well not-not really. I mean for me, myself, you know, I was thinking that, you know, well, I'm going to have-have a say so, but then again I have eleven other people with me. So, it's not just going to be on me. [¶]  Q. Was it your concern that you would have to make a decision that-[¶]  A. It's kind of-yeah, it's-I['m] dealing with his life. I don't know, I didn't want to just-it was just a shock when I first heard it. [¶]  But like I said, you know, if you balance it out, you know, the evidence, and you indicate for what it is-[¶]  Q. And you said it concerns the person's life. Did you mean the [petitioner]'s life? [¶]  A. Yes. Anyone. I mean I feel if it was-like I say, I have kids. If my son, you know, was up there, I would want people to-I wouldn't want him to just judge him by looks or-[¶]  Q. Of course. [¶]  A.-by him being-I mean I want you to respect, weigh it out.  You know, you get down to the nitty-gritty and find out what happened, what went on."  E.M.'s son was 18 years old, close in age to [petitioner].

The trial court reasonably concluded that the stated reasons for striking E.M. were race-neutral.  The court noted it had no way to confirm the prosecutor's claimed experience with "uncooperative" 7th Street postal workers but ultimately found the prosecutor's expressed

**United States District Court**
For the Northern District of California

concern was genuine, and not a pretext for racial discrimination.  A panelist's occupation and work environment are commonly used by advocates to assess possible bias or predisposition, and "[a]n advocate is permitted to rely on his or her own experiences and to draw conclusions from them."  (*People v. Lenix*, supra, 44 Cal.4th at p. 629.)  "[E]ven hunches and idiosyncratic reasons may support a peremptory challenge."  (*Ibid.*)  "[T]he question is not whether a different advocate would have assessed the risk differently, but whether this advocate was acting in a constitutionally prohibited way."  (*Ibid.*)  " 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' " (*Hamilton*, *supra*, 45 Cal.4th at p. 901.)

As with the prosecutor's reliance on E.M.'s employment, the court also carefully examined the prosecutor's statement that E.M.'s jail visits were a reason for striking him from the jury panel.  The court pointed out that other panelists had visited people in jail yet went unchallenged by the prosecutor.  The prosecutor acknowledged that some panelists had visited inmates as charity work, but she believed that none but the challenged panelists J.D. and E.M. had visited convicted felons who were friends or relatives.  The court was satisfied with the prosecutor's response and found no discrimination.  An advocate may reasonably think that a panelist's jail visits to friends or relatives may make the panelist unsympathetic to the prosecution.  (*People v. Farnam*, supra, 28 Cal.4th at p. 138.)

There were additional race-neutral reasons for striking E.M. from the jury panel.  E.M. failed to reveal his feelings about the effectiveness of the criminal justice system when asked to do so on the juror questionnaire.  A panelist's failure to respond to a question asking about his or her views on matters relevant to the proceedings is cause for concern.  (*People v. Cruz* (2008) 44 Cal .4th 636, 660.)  On voir dire, E.M. expressed hesitation about making a decision that would impact a young man's life.  E.M. said he was "stunned" and "shock[ed]" to think he might be a juror in a murder trial where he would have responsibility for determining the fate of another person.  E.M. was reminded of his son, who was close in age to [petitioner], in thinking about the decisions he would make as a juror.  A prospective juror's apprehension about serving on a jury or uncertainty about his or her ability to make determinations in a criminal trial are legitimate grounds for prosecutorial concern.  (*People v. Watson* (2008) 43 Cal.4th 652, 680-681; *People v. Crittenden* (1994) 9 Cal.4th 83, 118.)  A prosecutor is entitled to consider a prospective juror's ability to accept "responsibility for making weighty decisions."  (*People v. Lenix*, supra, 44 Cal .4th at p. 623.)  A prosecutor may also consider a prospective juror's pro-defense sympathy.  (*People v. Stanley* (2006) 39 Cal.4th 913, 939-940.)  E.M. suggested such sympathy here when the prosecutor queried E.M. about his concerns with the criminal justice system, and E.M. brought up his son and said that he would not want his son to be judged unfairly.

A comparative juror analysis does not undermine the trial court's finding that the prosecutor's stated reasons for challenging E.M. were genuine.  [Petitioner] argues that White panelists showed similar hesitation about sitting on a jury, yet were allowed to serve.  [Petitioner] first points to M.H., a White male panelist who was seated as juror No. 1.  The prosecutor asked M.H. if he could make a decision if there were "unanswered questions" in the case and he replied: "It would depend. I would have some reservations, I think-."  M.H. said he "would have a problem making a decision" if his mind were not clear "one way or

another." M.H.'s responses are not comparable to those of E.M. As the People point out on appeal, E.M. was concerned about unanswered questions and the standard of proof, not about deciding someone's fate. E.M.'s apprehension showed possible pro-defense sympathy, and this set him apart from M.H. As the prosecutor explained, E.M. "was uncomfortable making a decision because of the [petitioner]'s life," which raised a "concern that he might be empathetic towards the [petitioner]'s position." It is also significant that E.M. failed to answer the juror questionnaire on the subject of the effectiveness of the criminal justice system whereas M.H., when asked the same question, answered: "It works."

[Petitioner]'s comparison of E.M. with White panelist K.F., seated as an alternate juror, is also inapt. K.F. said she did not believe in the death penalty and did not know if she "could convict someone if the outcome could be [the] death penalty." K.F.'s hesitation related exclusively to the death penalty, which was irrelevant in this case. On voir dire, the court informed K.F. that the death penalty was not being sought and asked "now that you are assured this case does not involve the death penalty, do you have any concerns about whether you could come to a decision and reach a consensus with other fellow jurors?" K.F. replied: "I have no concerns about that. No." Moreover, K.F., unlike E.M., readily answered the question on the effectiveness of the criminal justice system, and said it was "very effective."

. . .

[Petitioner]'s remaining efforts at showing disparate treatment of panelists based on race are similarly unavailing. [Petitioner] argues that two seated jurors and all three alternate jurors visited jail, and thus are no different from E.M. The argument is unsupported by the record. Two of the alternate jurors (one of whom was African-American) had visited inmates for charitable purposes, not as support for convicted friends or relatives, which was the focus of the prosecutor's concern. The third alternate juror's sole experience with jails was his own arrest for "DUI" 13 years previously. This lone experience did not suggest pro-defense empathy, especially when considered with other information about his life experience set forth on the questionnaire, such as his 21 years of service in the Coast Guard. As for the regularly seated jurors, one of them, M.S., had a brother who served time in Idaho for stealing a drum set from a church. M.S. never said she visited him when he was jailed. M.S. did say she was surprised at her brother's conduct, felt he was rightfully charged with theft, and felt his punishment was commensurate with the crime he committed. The other seated juror identified by [petitioner], R.B., did visit a teenaged brother a couple of times when the brother had been in custody decades previously. R.B. was only 11 or 12 years old at the time of his jail visits. The prosecutor questioned R.B. closely about his brother to explore R.B.'s attitude toward law enforcement. R.B. said his brother was rightfully charged and convicted, and R.B. had no resentment toward the police. R.B. had family members who were in the legal profession and, when asked on the juror questionnaire about his feelings concerning the criminal justice system, said "I believe the criminal justice system is fair and effective." R.B.'s responses on the juror questionnaire and during voir dire are not comparable to E.M.'s responses.

Finally, [petitioner] argues that a number of seated jurors who were not African-American had children close in age to [petitioner] but were allowed to serve, while the prosecutor

12

used a peremptory challenge against E.M. for having a son near [petitioner]'s age.  But it was not simply having a child near [petitioner]'s age that raised the prosecutor's concern.  The concern was triggered by E.M.'s introduction of the subject of his son when discussing his feelings about the criminal justice system.  E.M. said if his son were "up there" on trial he would want people to weigh out the evidence and not "just judge him by looks."  In defending her peremptory challenge against E.M., the prosecutor noted the empathetic link E.M. made between his son and [petitioner] and told the court "he may put his son in the position where the [petitioner] is, and that's a concern of mine."  [Petitioner] has not identified any comparable responses by the panelists who were allowed to serve on the jury.  Substantial evidence supports the trial court's determination that the prosecutor challenged E.M. and the other African-American panelists for reasons unrelated to race.

Emory, 2009 WL 4680009 at *3-12 (footnotes omitted).

        b.    Analysis

The Equal Protection Clause forbids peremptory challenges of "potential jurors solely on account of their race."  Batson, 476 U.S. at 89.  A violation of equal protection under Batson is established in a three-step process: (1) the defendant must make out a prima facie case that the prosecutor exercised peremptory challenges on the basis of race "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose"; (2) if a prima facie case is established, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question; and (3) if the prosecutor comes forward with a race-neutral explanation, the trial court must determine whether the opponent of the strike has proved purposeful discrimination.  Johnson v. California, 545 U.S. 162, 168 (2005).

A federal habeas court need not dwell on the first step of the Batson analysis if the matter has proceeded to the second or third step.  "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."  Hernandez v. New York, 500 U.S. 352, 359 (1991).

Where the prosecution comes forward with an explanation of racial neutrality, proof of discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  See Hernandez, 500 U.S. at 355-62.  Such a finding turns largely on the trial court's evaluation of the prosecutor's credibility, Rice v. Collins, 546 U.S. 333, 340-42 (2006).  To fulfill its duty, the court must evaluate the prosecutor's proffered reasons and credibility in light of the totality of the

13

relevant facts, using all the available tools including its own observations and the assistance of counsel. <u>Mitleider v. Hall</u>, 391 F.3d 1039, 1047 (9th Cir. 2004). A legitimate reason "is not a reason that makes sense, but a reason that does not deny equal protection." <u>Purkett v. Elem</u>, 514 U.S. 765, 769 (1995). What matters is the "*genuineness* of the motive" behind the racially-neutral explanation, not "the *reasonableness* of the asserted nonracial motive." <u>Id.</u> (emphasis in original). "'To accept a prosecutor's stated nonracial reasons, the court need not agree with them. The question is not whether the stated reason represents a sound strategic judgment, but whether counsel's race-neutral explanation for a peremptory challenge should be believed.'" <u>Gaston v. Curry</u>, 406 Fed. App'x. 144, 145 (9th Cir. 2010) (quoting <u>Kesser v. Cambra</u>, 465 F.3d 351, 359 (9th Cir. 2006)).

AEDPA "'imposes a highly deferential standard for evaluating state-court rulings'" and "'demands that state-court decisions be given the benefit of the doubt.'" <u>Felkner v. Jackson</u>, 131 S. Ct. 1305, 1307 (2011) (quoting <u>Renico v. Lett</u>, 130 S. Ct. 1855, 1862 (2010)). More specifically, the findings of the state trial court on the issue of discriminatory intent are findings of fact entitled to the presumption of correctness in federal habeas review, see <u>Elem</u>, 514 U.S. at 769, as are the findings of the state appellate court, <u>see</u> <u>Mitleider</u>, 391 F.3d at 1050; <u>Williams v. Rhoades</u>, 354 F.3d 1101, 1108 (9th Cir. 2004). Under AEDPA, this means a state court's findings with respect to discriminatory intent are presumed sound unless a petitioner rebuts the presumption by clear and convincing evidence. <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005). "'[The federal court] must defer to the [state court's] conclusion that there was no discrimination unless that finding was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Gaston</u>, 406 Fed. App'x. at 145 (quoting <u>Cook v. LaMarque</u>, 593 F.3d 810, 816 (9th Cir. 2010)). A federal habeas court may grant relief only "if it was unreasonable to credit the prosecutor's race-neutral explanations for the <u>Batson</u> challenge." <u>Rice</u>, 546 U.S. at 338-41.

Here, the record does not support petitioner's assertion that the prosecutor's challenges were based on unconstitutional considerations. As to J.P., the prosecutor, as noted, explained that said juror showed a disrespectful attitude toward the court and hostility toward the police as indicated by his tardiness and responses to questions. (RT 523.) As to J.D., the prosecutor

1   explained that said juror believed a murder trial against her brother took place in the same

2   courtroom and involved the same counsel for the prosecution and defense.  (RT 524.)  There is

3   nothing in the record contradicting the prosecutor's assessment of these jurors.  Indeed, defense

4   counsel essentially acknowledged J.P.'s negative demeanor and acknowledged "Ms. [J.D.], bless

5   her heart, . . . thinks Ms.  McMahon was the prosecutor and I was the defense lawyer in . . . the

6   brother's prosecution for murder."  (RT 530.)  And, as noted by the Court of Appeal, the trial court

7   accepted "whole-heartedly" the prosecutor's justifications for striking J.P. and J.D.  (RT 531.)  Cf.

8   Lewis v. Lewis, 321 F.3d 824, 834-35 (9th Cir. 2003) (granting habeas relief on Batson/Wheeler

9   claim where the trial court "rejected some of the prosecutor's reasons, offered a conflicting

10  analysis of the record support for the prosecutor's third reason, and found only that the reason was

11  'probably . . . reasonable.'")

12          As to L.T., as the prosecutor explained, said juror: (1) had a negative reaction to the

13  Alameda County District Attorney's Office – the same prosecutorial agency involved in this case –

14  during a prior jury experience; and (2) had a negative experience with the Alameda County District

15  Attorney's Office in a battery case against him.  (RT 524-25.)  As the Court of Appeal found, these

16  prior experiences gave the prosecutor reason to believe said juror would question her capabilities.

17          As to E.M., as the prosecutor explained, said juror: (1) visited a friend in jail; (2) was

18  familiar with the crime scene area; (3) expressed discomfort with making a decision about a

19  defendant's life; and (4) had a son close in age to the defendant.  (RT 526.)  As the Court of Appeal

20  found, such factors gave the prosecutor reason to believe E.M. had apprehensions about sitting on a

21  jury and might show sympathy to petitioner.

22          Further, comparative juror analysis is a "well established tool" for detecting the third step

23  of the Batson analysis, i.e., "whether the opponent of the strike has proved purposeful

24  discrimination."  Batson, 476 U.S. at 98; Purkett v. Elem, 514 U.S. 765, 767 (1995).  It involves a

25  comparison between the responses given by the prospective jurors who were struck and those who

26  were not struck, to determine whether the prosecutor's motive was discriminatory in nature.

27  Snyder v. Louisiana, 552 U.S. 472, 484-85 (2008).

28

1    Here, the Court of Appeal conducted a comparative juror analysis with respect to J.D., L.T.,

2  and E.M.  As to J.D. and L.T., petitioner argued on appeal that a white female juror, M.S., was

3  seated as a juror despite showing hostility toward a prosecutor's office in Idaho.  The Court of

4  Appeal noted, however, that M.S.'s experience with a prosecutor's office was as a victim who felt

5  the offender had been treated too leniently, making M.S. more likely to be sympathetic to the

6  prosecution.  As a result, the Court of Appeal found M.S. was not similarly situated to J.D. – whose

7  brother was prosecuted for murder – or to L.T. – who was thought by the District Attorney's Office

8  to be the aggressor in a domestic disturbance.

9    As to E.M., petitioner argued on appeal that: (1) two white panelists who showed hesitation

10  about sitting on a jury were nonetheless allowed to serve; and (2) there were other seated jurors

11  who visited jails.  Again, the Court of Appeal found that E.M. was unique insofar as E.M. failed to

12  answer the juror questionnaire on his "feelings about the effectiveness of the criminal justice

13  system" and expressed concerns about deciding a person's fate.  In contrast, the two white panelists

14  indicated that they felt the criminal justice system worked and merely showed concern about

15  unanswered questions and the standard of proof as well as about the death penalty, which was not

16  an issue in this case.  The Court of Appeal further found that the seated jurors who had visited jails

17  had done so for charitable purposes, or – in the case of one juror – had done so as an 11 or 12 year

18  old child visiting a teenage brother in custody.

19    Finally, as noted by the Court of Appeal, at the end of jury selection, there was one African-

20  American juror on the panel and another African-American chosen as an alternate juror.  Emory,

21  2009 WL 4680009 at *3.  The fact that the prosecutor did not strike these two African-American

22  jurors further undermines petitioner's purported showing of purposeful discrimination.  See

23  Cooperwood v. Cambra, 245 F.3d 1042, 1048 (9th Cir. 2001) (finding no prima facie Batson

24  violation where ultimate composition of the trial jury included two African-Americans, three

25  Asian-Americans, and one Pacific Islander).

26    In sum, petitioner has not come forward with clear and convincing evidence to rebut the

27  presumption that the state court's conclusion was a reasonable one, nor has he otherwise shown

28

1  why this Court should accept his interpretation of the record over the trial court's credibility

2  determination.  See Miller-El, 545 U.S. at 240.

3        Accordingly, petitioner is not entitled to habeas relief on this claim.

4        2.    Marsden and Faretta Claims

5        Petitioner claims the trial court erred by: (1) failing to hold a Marsden hearing; and (2)

6  failing to grant his Faretta motion.  (Petition at 6.)

7        a.    Background

8        The jury returned its verdict on June 4, 2008.  (CT 234; RT 1233-34.)  The matter was

9  continued to July 18, 2008 for sentencing.  (RT 1237.)  Petitioner's Marsden and Faretta claims are

10  based on two letters he personally wrote to the trial court in this time period.  Because the letters

11  are missing from the copy of the Clerk's Transcript lodged by respondent, the Court relies on the

12  following description of the letters and intervening proceedings provided in the Court of Appeal

13  opinion:

> Several days before the scheduled sentencing hearing, on July 15, [petitioner] mailed a
> letter to the court raising various issues.  [Petitioner] advised the court that a new trial
> motion would be filed based on a number of grounds including "incompetence of [trial]
> counsel," with the "details" to be provided later.  [Petitioner] questioned whether his
> counsel was competent or willing to file a new trial motion, especially one asserting
> incompetent legal representation.  At one point, [petitioner] stated: "I[']m hoping that you
> will appoint me with new or separate counsel to defend me on these issues.  I am even
> willing to defend myself if necessary."  But the letter is far from clear in requesting
> substitute counsel.  The letter is inconsistent in its requests, saying, "I hope that you will
> agree that providing me with new counsel and a copy of the trial transcripts, will be the
> most sufficient [ sic ] thing to do" while saying in the very next paragraph that "this letter is
> solely to inform you of my intentions beforehand" so arrangements can be made "if counsel
> refuses to cooperate."
>
> On July 18, 2008, [petitioner]'s trial counsel filed a motion for new trial and sentencing was
> continued to August 29, 2008.  The motion was based on alleged insufficiency of the
> evidence and prosecutorial misconduct.  On August 25, 2008, [petitioner] wrote another
> letter to the court.  [Petitioner] complained that the new trial motion was inadequate and
> asked for substitute counsel: "I ask that you please stop all proceedings, reschedule our
> hearing on August 29th 2008, and appoint me with new counsel.  I[']m not certain if a
> [M]arsden motion needs to be filed at this point but if that is what I need to do then please
> don't hesitate to tell me.  I[']m even willing to represent myself on these matters."

Emory, 2009 WL 4680009 at *13-14.

//

United States District Court
For the Northern District of California

17

United States District Court
For the Northern District of California

b.     Marsden Claim

The trial court never held a Marsden hearing.[8]  At the August 29, 2008 hearing, the trial court acknowledged receiving petitioner's letters but proceeded to sentencing.  (RT 1243-45.)  The Court of Appeal agreed with petitioner that the trial court erred in failing to hold a Marsden hearing.  Emory, 2009 WL 4680009 at *14.  The Court of Appeal found, however, that the error was harmless:

> Although we reject the People's argument that [petitioner] abandoned his request for substitute counsel, we agree that the court's failure to hold a hearing on the request was not prejudicial and therefore does not warrant reversal.  (*Chapman v. California* (1967) 386 U.S. 18, 22-24; see *Marsden*, *supra*, 2 Cal.3d at p. 126 [applying *Chapman* harmless error standard]; see also *People v. Washington* (1994) 27 Cal.App.4th 940, 944 [affirming judgment under *Chapman* standard].)  This District Court of Appeal has held that a trial court's failure to conduct a *Marsden* hearing on a motion made after trial and entry of the jury's verdict is harmless where, as here, [petitioner] "has made no showing ... either that his *Marsden* motion would have been granted had it been heard, or that a more favorable result would have been achieved had the motion in fact been granted."  (*People v. Washington*, *supra*, at p. 944.)  There were no grounds for substituting present counsel, who had provided and continued to provide adequate representation.  Even if the motion had been granted, and another attorney appointed, [petitioner] would not have achieved a more favorable result in postconviction proceedings.  A different attorney would not have obtained a new trial or more lenient sentencing.  The evidence of [petitioner]'s guilt is overwhelming: an eyewitness watched [petitioner] shoot Dailey in the head.  Any error in failing to hold a *Marsden* hearing was harmless beyond a reasonable doubt.

Emory, 2009 WL 4680009 at *14.

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas.  Bland v. California Dep't of Corrections, 20 F.3d 1469, 1475 (9th Cir. 1994), overruled on other grounds by Schell v. Witek, 218 F.3d 1017 (9th Cir. 2000) (en banc).  The Ninth Circuit has held that when a defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction.  Id. at 1475-76; United States v. Robinson, 913 F.2d 712, 716 (9th Cir. 1990); Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982).  The inquiry

---

[8]  People v. Marsden, 2 Cal. 3d 118 (1970), requires the trial court to permit a criminal defendant requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing.  This California rule substantially parallels the one prescribed by the Ninth Circuit in Hudson v. Rushen, 686 F.2d 826, 829 (9th Cir. 1982).  See Chavez v. Pulley, 623 F. Supp. 672, 687 n.8 (E.D. Cal. 1985).

1    need only be as comprehensive as the circumstances reasonably would permit, however. <u>King v.</u>

2    <u>Rowland</u>, 977 F.2d 1354, 1357 (9th Cir. 1992) (record may demonstrate that extensive inquiry was

3    not necessary).

4         Sometimes the state court fails to rule on a <u>Marsden</u> motion.  If the state court fails to rule

5    on the motion, the defendant's failure to reassert the Marsden motion is not a waiver of the Sixth

6    Amendment claim if the defendant does not know that the trial court has erroneously failed to rule

7    on the motion.  <u>Schell v. Witek</u>, 218 F.3d 1017, 1023 (9th Cir. 2000) (en banc) (defendant did not

8    waive Sixth Amendment claim because trial counsel misled him to believe the motion to substitute

9    counsel had been denied rather than forgotten).

10        Regardless of whether the state court failed to rule on the motion to substitute counsel or

11   denied the motion, the ultimate inquiry in a federal habeas proceeding is whether the petitioner's

12   Sixth Amendment right to counsel was violated.  <u>Id.</u> at 1024-25 (overruling earlier circuit

13   precedent that had stated that habeas court's inquiry was whether the state court's denial of the

14   motion was an abuse of discretion).  That is, the habeas court considers whether the trial court's

15   denial of or failure to rule on the motion "actually violated [petitioner's] constitutional rights in

16   that the conflict between [petitioner] and his attorney had become so great that it resulted in a total

17   lack of communication or other significant impediment that resulted in turn in an attorney-client

18   relationship that fell short of that required by the Sixth Amendment." <u>Id.</u> at 1026.

19        In determining whether the trial judge should have granted a substitution motion, the

20   reviewing habeas court may consider the extent of the conflict, whether the trial judge made an

21   appropriate inquiry into the extent of the conflict, and the timeliness of the motion to substitute

22   counsel.  <u>Daniels v. Woodford</u>, 428 F.3d 1181, 1197-98 (9th Cir. 2005).

23        If a "serious conflict . . . resulted in the constructive denial of assistance of counsel," no

24   further showing of prejudice is required and the petitioner's trial is presumed to have been unfair.

25   <u>Schell</u>, 218 F.3d at 1027.  But if a serious conflict did not rise to the level of a constructive denial

26   of counsel, the petitioner must prove that he was prejudiced by the conflict.  <u>Id.</u> at 1028.

27        Here, while petitioner indicated by his letters he was dissatisfied with counsel, he failed to

28   allege that there was any lack of communication or irreconcilable differences between the two of

1   them.  Nor does he make any such allegations in the instant petition.  Indeed, petitioner fails to

2   allege any facts showing a conflict, let alone a "serious conflict."

3          Further, the trial court found petitioner was represented by "very able counsel" (RT 1242),

4   and the Court of Appeal found "there were no grounds for substituting [counsel], who had provided

5   and continued to provide adequate representation," Emory, 2009 WL 4680009 at *14.  Upon

6   review of the record, the Court agrees that counsel provided able representation, and there is no

7   evidence of serious conflict or prejudice.

8          Accordingly, petitioner is not entitled to habeas relief on this claim.

9                  c.      Faretta Claim

10         As noted above, petitioner further claims his letters invoked his right to self-representation

11  under Faretta, and that the trial court erred in failing to allow petitioner to represent himself.  The

12  Court of Appeal denied this claim as follows:

13         On a separate but related point, [petitioner] argues that his letters to the trial court
           constituted not only a request for substitute counsel, but an alternative request for self-
14         representation, which was wrongly ignored.  "Criminal defendants who wish to act as their
           own attorneys have a constitutional right to do so."  (*People v. Hines* (1997) 15 Cal.4th 997,
15         1028, citing *Faretta v. California* (1975) 422 U.S. 806.)  To invoke that right, however, a
           defendant must make an unequivocal assertion of the right.  (*Hines, supra*, at p. 1028.)
16

17         [Petitioner] did not unequivocally assert a right to self-representation.  His letters to the
           court complained about his appointed counsel's performance and, in the second letter, used
18         the term "[M]arsden motion" and asked the court to appoint new counsel.  [Petitioner]
           never asserted a right to self-representation, and mentions serving as his own attorney only
19         in passing to accentuate his displeasure with appointed counsel and to persuade the court
           that it should appoint new counsel.  Thus, in his first letter to the court, [petitioner] said:
20         "I[']m hoping that you will appoint me with new or separate counsel to defend me on these
           issues [of incompetence of counsel].  I am even willing to defend myself if necessary."
21         [Petitioner] told the court he had no money.  "Which is also why, if your honor doesn't
           grant me with the option of new counsel, I have no choice but to represent myself.  But
22         once all of the details are brought forward, I hope that you will agree that providing me
           with new counsel and a copy of the trial transcripts, will be the most sufficient [ *sic* ] thing
23         to do."  In his second letter to the court, [petitioner] asked the court to "appoint me with
           new counsel" and said "I[']m even willing to represent myself on these matters.  Which is
24         something that I am highly capable of doing.  For there isn't much else that I can ask for
           because it is evident that my current attorney ... is not in my best interest."
25

26         It is plain that [petitioner] wanted substitute counsel, and his tangential statements that he
27         was willing to represent himself "if necessary" and left with "no choice" were an
           argumentative device, not an unequivocal invocation of a constitutional right.  Defendants
28

displeased with appointed counsel commonly make remarks like the ones made by [petitioner].  Such remarks do not constitute an unequivocal invocation of the right of self-representation.  (E.g., *People v. Valdez* (2004) 32 Cal.4th 73, 98-99 [no invocation where, upon denial of *Marsden* motion, [petitioner] said " 'if I want to go pro. per. on this case I could do that' "]; *People v. Hines*, supra, 15 Cal.4th at pp. 1027-1028 [no invocation where defendant said, during a *Marsden* hearing, " 'I would be asking that if-if I can't get this granted, that I would like to proceed in pro per if possible' "]; *People v. Williams* (2003) 110 Cal.App.4th 1577, 1584-1585, 1593 [no invocation where defendant said, during a *Marsden* hearing, "Give me the opportunity to represent myself!"]; *People v. Skaggs* (1996) 44 Cal.App.4th 1, 5-6 [no invocation where defendant said, during a *Marsden* hearing, " 'I'd like to go pro per if I could' "].)

Emory, 2009 WL 4680009 at *15.

A criminal defendant has a Sixth Amendment right to self-representation.  Faretta v. California, 422 U.S. 806, 832 (1975).  But a request for self-representation must be unequivocal. Meeks v. Craven, 482 F.2d 465, 466-68 (9th Cir. 1973); accord Armant v. Marquez, 772 F.2d 552 (9th Cir. 1985).  The requirement of unequivocality serves two purposes: it ensures that the defendant does not inadvertently waive his right to counsel, Meeks, 482 F.2d at 467, and also prevents the defendant from taking advantage of the mutual exclusivity of the rights to counsel and self-representation, Adams v. Carroll, 875 F.2d 1441, 1444 (9th Cir. 1989).  If a defendant equivocates, he is presumed to have requested the assistance of counsel.  Id.; see also United States v. Bennett, 539 F.2d 45, 49-51 (10th Cir. 1976) (defendant who unquestionably vacillated between representation by counsel and self-representation until 6 days before trial forfeited right to self-representation); United States v. Oakey, 853 F.2d 551, 552-54 (7th Cir. 1988) (defendant's request for self-representation with co-counsel found equivocal because no right to such "hybrid" representation).  The court considers "three factors to determine whether a request for self-representation is unequivocal: the timing of the request, the manner in which the request was made, and whether the defendant repeatedly made the request."  Stenson v. Lambert, 504 F.3d 873, 882 (9th Cir. 2007).

Here, regarding the timing of the request, petitioner's "request" to represent himself – if it can be construed as such – was made after the close of trial, and petitioner does not claim that he was prevented from making the request earlier.  See Marshall v. Taylor, 395 F.3d 1058, 1061 (9th Cir. 2005) (state court's determination that petitioner's Faretta request made on the day of trial, but

21

1    before jury selection, was untimely, was not "contrary to" clearly established federal law under 28

2    U.S.C. § 2254(d)).  Regarding the manner in which the "request" was made, petitioner expressed a

3    clear preference for receiving new counsel over representing himself.  See Stenson, 504 F.3d at 883

4    (state court's determination that defendant had not made unequivocal request was not unreasonable

5    determination of the facts where defendant made several statements that he did not want to

6    represent himself but felt the court and existing counsel were forcing him to do so, defendant had

7    tried to locate another attorney, had not included a request to represent himself in his final written

8    request for new counsel, and requested a particular individual be retained as counsel).  Finally, it

9    cannot be said that petitioner "repeatedly" made a request for self-representation.  In light of the

10   evidence, the Court of Appeal's finding that petitioner's Faretta request was equivocal was not an

11   unreasonable determination of the record.  28 U.S.C. § 2254(d)(2).

12          Accordingly, petitioner is not entitled to habeas relief on this claim.

13   C.     Certificate of Appealability

14          The federal rules governing habeas cases brought by state prisoners require a district court

15   that issues an order denying a habeas petition to either grant or deny therein a certificate of

16   appealability.  See Rules Governing § 2254 Case, Rule 11(a).

17          A judge shall grant a certificate of appealability "only if the applicant has made a

18   substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the

19   certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district

20   court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)

21   is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district

22   court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S.

23   473, 484 (2000).

24          Here, petitioner has not made such a showing, and, accordingly, a certificate of

25   appealability will be denied.

26   //

27   //

28   //

United States District Court
For the Northern District of California

22

# IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Warden Ron Barnes on the docket as the respondent in this action.

The Clerk is further directed to change petitioner's address to Chris Wayne Emory, #G-31014, High Desert State Prison, P.O. Box 3030, Susanville, CA 96127-3030.

**IT IS SO ORDERED.**

Dated: March 12, 2013

_____
JON S. TIGAR
United States District Judge

**United States District Court**
For the Northern District of California

23